United States District Court
for the
District of Massachusetts
Case No.: 1:25-cv-11707

---

Emily Marjorie Johnston Cross,

Plaintiff,

-vs-

Matthew Lavoie and Richard Cosgrove,

Defendants.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.  Tragedy struck Ms. Cross and her family in June 2021: her infant son, Marty, silently passed away while sleeping beside her.

2.  She was, and still is, absolutely devastated by Marty's loss. Nothing eases the pain of his absence.

3.  Immediately after his death, Ms. Cross began the agonizing and difficult process of reporting his death to the appropriate authorities and arranging services to celebrate his life.

4.  Unfortunately, and unbeknownst to Ms. Cross, her pain and suffering would only deepen at the hands of the Defendants.

5.  In the days after Marty's death, Defendant Matthew Lavoie, an investigator with the Massachusetts State Police, investigated Ms. Cross and blamed her for Marty's death.

6. As a result, Ms. Cross faced months of further investigation to determine whether she was fit to continue parenting her sole, surviving child: Marty's older sibling.

7. Thankfully, due largely to the efforts of a local police officer, her older child was not taken from her.

8. But after Ms. Cross spoke publicly about her ordeal and unintentionally interacted with Defendant Lavoie, he began a campaign of retaliation and intimidation against her.

9. He was assisted in this endeavor by Defendant Richard Cosgrove, also of the Massachusetts State Police.

10. Ms. Cross now brings this action to, again, shine a light on law enforcement misconduct and vindicate her rights as guaranteed under the Constitution of the United States, the Massachusetts Declaration of Rights, and the laws of both the United States and the Commonwealth of Massachusetts.

## Jurisdiction and Venue

11. This Court has jurisdiction over Ms. Cross's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

12. Venue is proper in this District under 28 U.S.C. § 1391 because the events giving rise to these claims occurred in the Commonwealth of Massachusetts.

## Parties

13. Plaintiff Emily Cross is a resident of East Sandwich, Massachusetts.

14. Defendant Matthew Lavoie is a Massachusetts State Police ("MSP") officer who, at all relevant times, acted under color of state law. He is sued in his individual and official capacity. Upon information and belief, he is a resident of the Commonwealth of Massachusetts.

15. Defendant Richard Cosgrove is also an employee of MSP and acted at all relevant times under color of state law. He is sued in his individual and official capacity. Upon information and belief, he is a resident of the Commonwealth of Massachusetts.

## Facts Alleged

### I.    Tragedy Strikes Ms. Cross and her Family

16. In June 2021, Ms. Cross endured the most devastating event a mother can face: the sudden death of her one-month-old infant son, Marty. Marty died in the early



morning hours of June 29, 2021 while sleeping beside Ms. Cross.

Ms. Cross, Marty, and his father, Matt O'Duffy Johnston, shortly after Marty's birth.

17. Shortly after Ms. Cross dutifully reported Marty's death, law enforcement and child welfare officials descended upon Ms. Cross's life.

18. One of the investigating organizations, MSP, assigned Defendant Lavoie to investigate Marty's death.

19. During this investigation, Lavoie subjected Ms. Cross to intense scrutiny and suspicion. He asked accusatory questions and, rather than treating her with the compassion she deserved as a grieving mother, he treated her as the apparent murderer of her own infant son.

20. After his investigation, Defendant Lavoie filed a report under M.G.L. c. 119, § 51A[1] with the Department of Children and Families ("DCF") alleging that Marty's death was caused by parental neglect.

21. Defendant Lavoie noted that Ms. Cross had been co-sleeping with Marty and cited details such as the condition of Ms. Cross's home—observing "dirty dishes in the sink and kitchen counter"—in a manner meant to paint her as neglectful when, in fact, she was not.

---

[1] Under § 51A(a) and (d), a "mandated reporter"—which includes "a . . . police officer" under G.L. c. 119, § 21—"shall" report abuse or neglect endured by a child *provided* the mandated reporter, "in his professional capacity . . . has ***reasonable cause*** to believe that a child has died as a result" of a list of conditions defined in § 51A(a). Those conditions include "abuse inflicted upon [the child] which causes harm or substantial risk of harm to the child's health or welfare, including sexual abuse; (ii) neglect, including malnutrition; [and] (iii) physical dependence upon an addictive drug at birth." G.L. c. 119, § 51A(a).

22. Defendant Lavoie also highlighted aspects of Ms. Cross's personal history—including past, legal marijuana use—which had no bearing on the cause of Marty's death and were meant only to demean and inculpate her.[2]

## II.    DCF Investigates Ms. Cross

23. As a direct result of Defendant Lavoie's investigation and § 51A report, DCF took swift action against Ms. Cross.

24. Within days, DCF made a "supported finding" of neglect, blaming Ms. Cross for Marty's death while she was still in the acute stages of grieving and even accused her of neglecting her older child who, at the time, was three years old.

25. DCF officials raised the specter of criminal prosecution for Marty's death and suggested they would seize her surviving child from her custody.

26. Ms. Cross was, understandably, horrified. While still enduring intense pain accompanying the grief of Marty's death, government officials were now blaming her for his death and threatening to imprison her for it and forcibly remove Marty's older sibling from her care.

27. DCF placed Ms. Cross's name on the Commonwealth's central registry of child abusers. Her name now appears alongside convicted sex offenders and others deemed unsafe as caregivers.

28. Being listed in this registry carries a heavy stigma; since Marty's death, Ms. Cross has struggled to maintain employment and pay her bills.

---

[2] No marijuana was found in Marty's system after his death. When authorities responded to Ms. Cross's home after she reported Marty's death, neither her nor Marty's father appeared under the influence of marijuana and their home did not smell like marijuana or smoke.

29. And when Ms. Cross's older child asked to adopt a new baby, Ms. Cross had to decline; she was on a list prohibiting her from doing so.

30. All these punitive actions occurred in the immediate aftermath of Ms. Cross losing Marty, exponentially compounding her trauma.

31. Thankfully, a local police officer, Eastham[3] Police Lieutenant Robert Gus Schnitzer, knew Ms. Cross's family and advocated on her behalf to DCF. In DCF's report concluding not to remove Ms. Cross's older child from her and Matt's custody, DCF noted the advocacy of Lt. Schnitzer.

### III.    Ms. Cross Exposes Defendant Lavoie's and DCF's Misconduct

32. In late 2023, Ms. Cross decided to speak publicly about the systemic mistreatment she endured at the hands of Defendant Lavoie and DCF. She participated in one part of a three-part investigative journalism series from The Boston Globe's Spotlight Team entitled "Cradle of Doubt." The series was specifically designed to highlight the Commonwealth's approach to co-sleeping with infants.

33. Ms. Cross's part was entitled "Judging Emily," a copy of which is attached as Exhibit 1.

34. Spotlight's coverage of Ms. Cross's case highlighted how government officials often blame parents, and especially low-income parents, who endure the tragedy of an infant's death instead of treating the parents with compassion.

---

[3] Ms. Cross, Matt, Marty, and Marty's older sibling lived in Eastham when Marty passed away. They later moved to East Sandwich.

35. The article recounted Ms. Cross's ordeal: how Defendant Lavoie[4] and DCF accused her of killing her own baby, threatened to remove her other child, and placed her on a registry of abusers despite a lack of definitive evidence of wrongdoing. Ex. 1 at 3-6, 21-23.

36. It also explored the socio-economic bias underlying such cases—noting, for example, that Ms. Cross felt she might have been treated more leniently had she been wealthier or had a more "tidy" household. Ex. 1 at 7.

37. Finally, and most importantly, pathologists at Boston Children's Hospital "found evidence of vulnerabilities in Marty's brain and lungs that are frequently reported in [sudden infant death syndrome] cases." Ex. 1 at 23. While the cause of Marty's death remains unknown, the BCH findings support the conclusion that Ms. Cross did not contribute to Marty's tragic passing.

38. Spotlight cast Ms. Cross as a whistleblower of sorts, exposing how authorities, including Defendant Lavoie, mishandled her case and potentially others. The "Cradle of Doubt" Series brought significant public attention to Ms. Cross's story and, by extension, to Defendant Lavoie's role in the 2021 investigation.

39. Due to the significant public attention, and upon information and belief, Defendants were aware of the "Cradle of Doubt" Series, including Ms. Cross's article, "Judge Emily," and were angry with Ms. Cross for how she portrayed Defendant Lavoie, MSP, and DCF.

---

[4] Ms. Cross did not name Defendant Lavoie in the article. It is undisputed, however, that he investigated Marty's death.

### IV.    Ms. Cross Unwittingly Contacts Defendant Lavoie's Spouse

40. In the spring of 2024, Ms. Cross began searching for enriching, community-based activities in which her older child could participate. She identified Cub Scouts as one such activity based on her spouse: Matt is an Eagle Scout, the highest rank attainable in the Boy Scouts of America.

41. On May 10, 2024, Ms. Cross sent an email inquiry to a generic contact address for the local Sandwich Cub Scouts pack—sandwichcubmaster@gmail.com. Three names were listed with the email address: Cubmaster Mikaela Strazzulo, James Porter, and Committee Chair Brad Dowie. Ms. Cross did not recognize these names and knew of no connection to anyone else known to her.

42. In Ms. Cross's email, she politely asked about how to register her child and inquired about meeting schedules, frequency, and costs.

43. Unbeknownst to Ms. Cross at the time, that generic Cub Scout email address was actually monitored by Defendant Lavoie's spouse, Sarah Lavoie, who was a leader in the Cub Scout pack.

44. Shortly after sending her inquiry, Ms. Cross received a reply from the Cub Scouts address. The reply thanked her for inquiring and noted that the inbox for sandwichcubmaster@gmail.com was not checked frequently outside of recruitment season.

45. The reply instructed Ms. Cross to email a different address—lavoie3138@gmail.com—for more information about the pack.

46. Ms. Cross dutifully followed this instruction, unaware of any personal significance. That same afternoon, she forwarded her original inquiry to the lavoie3138@gmail.com address as directed, with a brief note saying, "Hello, please see below. Thank you!".

47. At the time Ms. Cross sent this follow-up email, she had no idea that "lavoie3138" referred to anyone associated with Defendant Lavoie; the name "Lavoie" was not mentioned in the Cub Scout website or initial reply, and it did not occur to her that the email address was in any was associated with anyone who had investigated her in 2021. In Ms. Cross's eyes, she was simply corresponding with a local Cub Scout troop leader about enrolling her child.

## V.    Ms. Cross Engages in Protected, Public Speech

48. A few days after the Cub Scouts email exchange, in mid-May 2024, posts from an anonymous Facebook account appeared on a community Facebook group called "The Sandwich Scoop." In these posts, an individual expressed concern about a situation strikingly similar to what Ms. Cross had experienced. The first post stated that the author wanted to sign up her son for Sandwich Cub Scouts "but the leader was married to someone that tried to kidnap her son in 2021."

49. The post further referenced a "state police lieutenant" and indicated that an Eastham police officer had stopped the kidnapping—details which clearly alluded to Ms. Cross's 2021 encounter with Defendant Lavoie.

50. A second post, made a few hours later in the same group, asked the community, "What do we do about the kidnapping Cub Scout leader?".

51. These Facebook posts did not name Defendant Lavoie, his spouse, or Ms. Cross explicitly. They were written anonymously and referred obliquely to the people involved.

52. Nevertheless, a person familiar with Ms. Cross's mistreatment could connect the references.

53. Ms. Cross later acknowledged that, while she was the person behind the first post, she did not author the second post. The first post was born out of frustration and civic alarm; Ms. Cross wanted to warn other local parents that a law enforcement officer who had grossly overstepped his authority with her family was involved in the Cub Scouts.

54. Ms. Cross's intent was to summarize her experience and to voice concern about his involvement in a children's organization.

55. These online comments by Ms. Cross were constitutionally protected speech: she was speaking out on a matter of public concern—the conduct of a law enforcement officer and the safety of children—based on her own true experiences.

56. Instead of treating them accordingly, Defendant Lavoie reacted with anger and a strong desire for reprisal.

**VI.    Defendant Lavoie Intimidates Ms. Cross**

57. On Sunday, June 9, 2024, Ms. Cross was at the Nova Trampoline Park in Plymouth, Massachusetts, enjoying a family outing with her husband and child. By coincidence, Defendant Lavoie was also at the facility with his family, celebrating one of his children's birthdays.

58. Ms. Cross had neither seen nor interacted with Defendant Lavoie since his investigation three years prior.

59. At approximately 11:37 a.m., and while Defendant Lavoie was standing and speaking with an individual later identified as Brian Pettinato, she approached her spouse, Matt, who was standing nearby.[5] She noticed Defendant Lavoie in her peripheral vision, looked at him, and felt that he looked vaguely familiar. He asked her, "do I know you?". She then asked Defendant Lavoie if he worked in law enforcement. He reluctantly confirmed.

60. Since Marty's death and the subsequent investigation, Ms. Cross had dealt with acute symptoms of anxiety, depression, and post-traumatic stress disorder ("PTSD").

61. When Defendant Lavoie confirmed he worked in law enforcement, Ms. Cross immediately placed him. Fear, dread, and panic gripped her.

62. She then looked at her husband, Matt, and stated, in sum and substance, that Defendant Lavoie "was the motherfucker who thinks he's a doctor," referring to his role in the investigation into Marty's death.

63. She then walked away as her PTSD symptoms continued to pummel her.

64. She made no further statements nor interacted with Defendant Lavoie or Mr. Pettinato further. The entire interaction lasted approximately 30 seconds.

65. After Ms. Cross left, she sat in a chair near the lobby of Nova Trampoline Park to calm herself before leaving.

---

[5] These events are captured on surveillance footage from Nova Trampoline Park. The footage carries no audio but is time- and date-stamped.

66. Approximately six minutes after the first interaction, Defendant Lavoie approached Ms. Cross on foot.

67. He was visibly angry. He accused Ms. Cross of "harassing" him and his family, referencing the recent Facebook posts and the Cub Scout email. He used his physical presence[6] and authority to intimidate Ms. Cross—stepping toward her, raising his voice, and telling her that she needed to leave or else he would involve the police.

68. Ms. Cross, stunned and fearful, tried to disengage. She asked Defendant Lavoie to leave her alone. But Defendant Lavoie persisted, at one point warning her that if she did not leave the premises, she would be arrested. Believing that Lavoie could and would, indeed, misuse his power, Ms. Cross felt she had no choice but to leave. She was so frightened by Lavoie's hostile behavior that she left the trampoline park immediately, without even gathering her husband or child, in order to avoid any further escalation.

69. What should have been a fun family outing ended with Ms. Cross shaking, alone in the parking lot, calling her husband to quickly grab their child and leave. This incident was deeply traumatic for Ms. Cross—a stark reminder that, in any encounter with Defendant Lavoie, she could be targeted and harmed under the color of law.

---

[6] While Defendant Lavoie's height and weight are unknown, the size difference between him and Ms. Cross in the Nova Trampoline Park surveillance footage is striking.

## VII.    Defendant Lavoie Accuses Ms. Cross of Criminal Harassment

70. After the Nova Trampoline Park incident, Defendant Lavoie immediately sought to turn the situation to his advantage by officially portraying himself as the victim.

71. The same day as the Nova Trampoline Park Incident—June 9, 2024—Defendant Lavoie went to the Plymouth Police Department and filed a police report against Ms. Cross.

72. In that report, he claimed that Ms. Cross approached and harassed him. Specifically, Lavoie told Plymouth Police Officer Brendan Rix that Ms. Cross had followed him around the trampoline park, yelling and causing a scene.

73. He further claimed that Ms. Cross hurled vicious insults at him—including an outrageous claim that she said, "You are the only person whose kids I wish would die," purportedly referring to Defendant Lavoie's young children who were with him at the park.

74. According to Lavoie's account, Ms. Cross also supposedly admitted to making the Facebook posts, taunted him about the Cub Scouts, and generally refused to leave him alone.

75. He claimed that when Ms. Cross saw him at Nova Trampoline Park, she initiated both encounters by calling him a "kidnapper" and continued to harass him despite his attempts to disengage.

76. Importantly, Defendant Lavoie admitted to Officer Rix that he never called 911 or sought help during the incident—instead, he chose to handle it afterward by filing a walk-in report and pursuing legal action.

77. Officer Rix documented Defendant Lavoie's statements in an incident report and advised Defendant Lavoie of his right to seek a civil Harassment Prevention Order (HPO) under Massachusetts law. Defendant Lavoie confirmed he understood his rights and noted he was making the report for the purpose of seeking and receiving an HPO.

78. The Plymouth Police report listed Ms. Cross as a "suspect" for the offense of Criminal Harassment and Defendant Lavoie as the "victim," officially framing what happened as a crime committed by Ms. Cross.

79. In reliance on Defendant Lavoie's account, Officer Rix took steps to contact Ms. Cross.

80. Ms. Cross was not immediately reached by Plymouth Police that day, but she soon learned that Defendant Lavoie had swiftly transformed their brief encounter into a law enforcement matter with her as the accused.

## VIII. Nova Trampoline Park's Surveillance Footage Exposes Defendant Lavoie's Lies

81. Unbeknownst to Defendant Lavoie, the entire June 9th incident at the Nova Trampoline Park was captured on the facility's security cameras.

82. Upon learning of Defendant Lavoie's accusations, Ms. Cross obtained the available surveillance footage, which starkly contradicts Lavoie's version of events.

83. The video shows that Ms. Cross did not stalk or follow Lavoie; rather, any proximity between them was incidental to supervising their respective children in a public space.

84. The footage further shows that Lavoie initiated the second encounter by approaching Ms. Cross.

85. In essence, the objective evidence validates Ms. Cross's account and disproves key elements of Defendant Lavoie's claims.

86. Ms. Cross reported to the authorities that Defendant Lavoie's statements were false and provided the name of a neutral eyewitness—the manager of Nova Trampoline Park—who could corroborate her account.

87. Unfortunately, by the time this evidence emerged, the wheels of Defendant Lavoie's retaliation were already in motion.

## IX.    Defendant Lavoie Wrongfully Uses the Legal System to Retaliate against Ms. Cross

88. On June 10, 2024—the very next business day after the trampoline park incident—Defendant Lavoie took the extraordinary step of seeking a Harassment Prevention Order against Ms. Cross in court.

89. Defendant Lavoie applied under G.L. c. 258E for an *ex parte* order from the Barnstable District Court.

90. In his application, Lavoie cited three purported acts of "harassment" by Ms. Cross: (1) the Cub Scout email that had reached his wife, (2) the anonymous Facebook posts accusing him of trying to "kidnap" a child, and (3) the encounter at Nova Trampoline Park on June 9th.

91. Based on Lavoie's sworn allegations in his affidavit and complaint, a Barnstable District Court judge issued a temporary Harassment Prevention Order that same day, June 10, 2024, against Ms. Cross. The court apparently credited Lavoie's narrative that Ms. Cross had engaged in a pattern of harassment. Ms. Cross was served with the HPO shortly thereafter.

92. The Order required Ms. Cross, effective immediately, to stay away from and have no contact with Defendant Lavoie or his family, and to cease what the court had been led to believe was "harassing" conduct.

93. For Ms. Cross, the issuance of this HPO was devastating and surreal: she found herself legally forbidden from speaking about or to the very person who was, in her view, victimizing her. Even though she had done nothing more than speak the truth about Defendant Lavoie's actions, she was now under threat of arrest if she came near him or even if she attempted to explain the true events. She also knew that her son could no longer participate in her family's local Cub Scout pack, dashing their child's dreams of following in their father's footsteps and becoming an Eagle Scout.

94. Ms. Cross nevertheless resolved to contest the order and clear her name at the upcoming hearing scheduled by the court.

## X.    Defendant Cosgrove Further Intimidates Ms. Cross

95. While the *ex parte* harassment order was in place but before the court's hearing on whether to extend it, Defendant Richard Cosgrove inserted himself into the situation in a highly unsettling manner.

96. On June 13, 2024, Ms. Cross was at work when Defendant Cosgrove showed up unannounced at her home in East Sandwich.

97. Defendant Cosgrove was not a stranger to Ms. Cross—he was one of Defendant Lavoie's colleagues in 2021, involved peripherally in the aftermath of Marty's death. Upon information and belief, Defendant Cosgrove, aware of the harassment order and likely at Defendant Lavoie's request, decided to personally pay a visit to Ms. Cross's residence.

98. Ms. Cross was not home, but Defendant Cosgrove's nevertheless left his official MSP business card wedged in the door with a handwritten message on the back: "Emily, please call me."

99. He then proceeded to go door-to-door to Ms. Cross's neighbors, asking at least one neighbor questions about Ms. Cross and whether she was around.

100.    Defendant Cosgrove's actions spoke volumes: if Ms. Cross continued to express herself via protected speech, Defendant Lavoie and his colleagues at MSP would stop at nothing to find Ms. Cross, her family, friends, and neighbors, and address their "misbehavior."

101.    This unexpected appearance of a high-ranking MSP officer in her neighborhood alarmed and confused Ms. Cross's family and neighbors.

102.    Given that the harassment order was in effect, Ms. Cross was terrified that returning Defendants Lavoie and Cosgrove were trying to entrap her; based on the HPO, returning Cosgrove's call might somehow violate the order.

103.    To avoid any allegation that she was disobeying the HPO, Ms. Cross did not call Cosgrove herself. Instead, her husband called the number on the card while Ms. Cross listened.

104.    When Ms. Cross's husband reached Defendant Cosgrove by phone, Defendant Cosgrove stated that he "wanted [Ms. Cross] to know how child death investigations work."

105.    In this brief conversation, Defendant Cosgrove referenced the Boston Globe article that had featured Ms. Cross and the statistics cited therein about child death inquiries.

106.    The clear subtext of Defendant Cosgrove's message was that Ms. Cross had mischaracterized the 2021 investigation in the media and that Defendants Lavoie and Cosgrove and MSP took issue with her going public.

107.    In essence, Defendant Cosgrove sought to "set Ms. Cross straight" about her criticisms of MSP.

108.    Ms. Cross and her husband were taken aback by Defendant Cosgrove's tone during the call. There was no legitimate law enforcement purpose for Defendant Cosgrove's visit; neither Ms. Cross, her family and neighbors, nor anyone living nearby had reported any crime. Nor was Defendant Cosgrove investigating anything at that moment that required him to lecture a civilian on police procedure.

109.    The only context for this contact was Defendant Lavoie's ongoing campaign to retaliate against and intimidate Ms. Cross.

110.    To Ms. Cross, Defendant Cosgrove's message, delivered just days before the HPO hearing, was clear: "We know you have been talking publicly about Marty's death and our investigation. We do not like what you're saying. We strongly suggest you stop."

111.    Ms. Cross was terrified. She felt that Defendants Lavoie and Cosgrove were signaling that they had the power of MSP behind them, and that they could appear at her doorstep or in her life whenever they pleased should she continue to speak out.

112.    Her fear was not unfounded; in the span of five days, she had been intimidated by Defendant Lavoie, received an *ex parte* HPO ordering her to remain silent, and received a home visit by Defendant Cosgrove, all for lawfully voicing her story.

## XI.    Defendant Lavoie Perjures Himself

113.    On June 20, 2024, the Barnstable District Court held a hearing to determine whether it should extend the temporary HPO against Ms. Cross.

114.    Defendant Lavoie appeared in Court represented by an attorney.

115.    Ms. Cross also appeared, self-represented, to defend herself.

116.    Defendant Lavoie testified under oath. He repeated the false claims from his affidavit; he accused Ms. Cross of a pattern of harassment which included the Cub Scout email, the Facebook posts, and Ms. Cross's alleged behavior at Nova Trampoline Park.

117.    His description of Ms. Cross's Cub Scout email was, at best, intentionally misleading. He testified that his spouse "received an email to her personal account asking—from Ms. Cross asking for information about signing her [child] up for Cub Scouts."

118.    Upon information and belief, Defendant Lavoie knew the process via which an individual communicated about Cub Scouts and knew no information directly or clearly identified either him or his spouse. Upon information and belief, he also knew from the content of Ms. Cross's email that there was no indication she knew or thought she was contacting Defendant Lavoie or his spouse. Upon information and belief, Defendant Lavoie intentionally omitted this information from his testimony to retaliate against and intimidate Ms. Cross.

119.    Defendant Lavoie also testified as to the second encounter at Nova Trampoline Park as follows:

> My daughter went to play in another part of the facility. I stopped to watch her. As I looked over, I saw Ms. Cross sitting on a chair next to me . . . [Ms. Cross] stated to me that I was the one that approached her, even though I was not. I was following my daughter around to ensure her safety.

120.    To reiterate, there were two encounters between Ms. Cross and Defendant Lavoie at Nova Trampoline Park, both of which were captured by surveillance footage.

121.    In the first, Defendant Lavoie—in a maroon, short-sleeve shirt, khaki shorts, and black shoes with white socks—is standing next to two other individuals. Ms. Cross approaches on foot, interacts with Defendant Lavoie, makes a statement,

and leaves. No chairs are within the frame of the surveillance footage. No one is seated.

122.    After the first encounter, Ms. Cross finds a seat near the lobby of Nova Trampoline Park.

123.    Approximately six minutes after the first encounter, Defendant Lavoie, in the same clothing as the first encounter, is seen walking up a ramp and toward Ms. Cross, who is seated and appears to be engaged with her smartphone.

124.    Defendant Lavoie then walks over to Ms. Cross and begins speaking with her. Both are seen gesturing at each other for approximately 45 seconds. Defendant Lavoie then slowly walks away from Ms. Cross, who gets up and walks quickly out of Nova Trampoline Park.

125.    At no point in the second encounter is Defendant Lavoie seated.

126.    And, because Ms. Cross was seated in a stationary chair, it was impossible for her to approach Defendant Lavoie. He, in fact, approached her.

127.    Defendant Lavoie also testified to misusing law enforcement resources to investigate Ms. Cross. He testified that "I did report [the Facebook post] to my supervisors and they directed [MSP] to submit legal process to Facebook to determine who posted the anonymous post."

128.    Ms. Cross also testified.

129.    Her statements to the court were heartfelt: she emphasized that she posed no threat to Defendant Lavoie and his family, that she simply wanted to be left

alone, and that the only reason she had ever mentioned Defendant Lavoie publicly was to seek justice for what had happened to her family.

130.     She described the severe emotional distress she'd suffered in the week since the temporary order was issued—panic, fear, lost sleep, lost work—all due to Defendant Lavoie's actions and Defendant Cosgrove's frightening visit.

131.     After hearing all the evidence, the Court ultimately extended the HPO against Ms. Cross.

132.     Ms. Cross left the courtroom that day feeling defeated and re-victimized: Defendant Lavoie had again co-opted the legal system, this time to punish her for speaking out, and now a court's imprimatur accompanied that punishment.

## XII.    Defendants' Retaliation and Intimidation Take Their Intended Toll on Ms. Cross

133.     Defendants' misconduct has severely affected Ms. Cross's mental, emotional, and physical well-being. Since June 9, 2024, Ms. Cross has been in a state of persistent anxiety and distress. She has suffered panic attacks and nightmares, and she has repeatedly sought therapy from two healthcare providers to cope with the trauma.

134.     Defendants' campaign of intimidations has, unfortunately, succeeded; Ms. Cross is perpetually afraid of Defendants and MSP surveilling and confronting her.

135.     For a time, she avoided public gatherings in her own community, worried that if she ran into Defendant Lavoie or any of his family or friends, it could lead to further false accusations.

136.    The HPO has hung over Ms. Cross like a cloud; Ms. Cross's reputation in her small community has been harmed by the stigma of having an HPO against her.

137.    Ms. Cross has also lost income. She missed work days to attend court and was emotionally unable to function, especially in the days immediately surrounding the June 2024 incidents.

138.    Finally, the chilling effect on Ms. Cross's speech has also been significant: whereas she once was willing to speak to the media and post on social networks about her case, she now feels unsafe in doing so.

139.    Defendants' retaliatory actions have silenced her, which was, of course, their goal from the outset.

140.    Ms. Cross now files this lawsuit to obtain justice for the wrongs done to her and to affirm that law enforcement officers cannot trample on the rights of citizens who criticize them.

### Count 1
### First Amendment Retaliation under 42 U.S.C. § 1983 against all Defendants

141.    Ms. Cross incorporates by reference all prior paragraphs.

142.    146.    During all events described, Defendants were acting under color of state law as on-duty law enforcement officers.

143.    147.    As a result of Defendants' actions, Ms. Cross was denied her rights as guaranteed under the First Amendment to the Constitution of the United States.

144.    Specifically, Ms. Cross engaged in conduct which was protected by the First Amendment to the Constitution of the United States.

145.    Defendants retaliated against Ms. Cross directly because of her protected conduct.

146.    There was no legal basis for Defendants' retaliation.

## Count 2
### Fourth Amendment violation under 42 U.S.C. § 1983 against all Defendants

147.    Ms. Cross incorporates by reference all prior paragraphs.

148.    During all events described, Defendants were acting under color of state law as on-duty law enforcement officers.

149.    As a result of Defendants' actions, Ms. Cross was denied her rights as guaranteed under the Fourth Amendment to the Constitution of the United States.

## Count 3
### Massachusetts Civil Rights Act, G.L. c. 12, § 11I, against all Defendants

150.    Ms. Cross incorporates by reference all prior paragraphs.

151.    Defendants, acting in concert, interfered with Ms. Cross's civil rights through threats, intimidation, and coercion.

152.    Their conduct was aimed at silencing her and punishing her for protected conduct.

## Count 4
### Intentional infliction of emotional distress against all Defendants

153.    Ms. Cross incorporates by reference all prior paragraphs.

154.    Defendants intended to inflict emotional distress on Ms. Cross or knew or should have known that emotional distress was likely to result.

155.     Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized society.

156.     Defendants' caused Ms. Cross's emotional distress.

157.     Ms. Cross suffered severe emotional distress of a nature that no reasonable person could be expected to endure it.

## Count 5
### Abuse of process against Defendant Lavoie

158.     Ms. Cross incorporates by reference all prior paragraphs.

159.     Defendant Lavoie used legal process for an improper purpose—to punish, silence, and retaliate against Ms. Cross rather than for legitimate legal protection.

## Count 6
### Civil rights conspiracy under 42 U.S.C. § 1985(3) against all Defendants

160.     Ms. Cross incorporates by reference all prior paragraphs.

161.     Defendants engaged in a common design or agreement, express or otherwise.

162.     The purpose of the common design or agreement was to deprive Ms. Cross of the equal protection of the laws.

163.     Specifically, Defendants were motivated, in part, by animus related to Ms. Cross's gender and social status as a whistleblower challenging institutional authority.

164.     One or more of the Defendants engaged in an overt act in furtherance of the common design or agreement.

165.    Ms. Cross was injured because of the common design or agreement and/or the overt act in furtherance of the common design or agreement and/or Ms. Cross was deprived of a constitutionally protected right because of common design or agreement and/or the overt act in furtherance of the common design or agreement.

## Count 7
### Coercive common law conspiracy against all Defendants

166.    Ms. Cross incorporates by reference all prior paragraphs.

167.    Defendants acted in unison with a peculiar power of coercion over Ms. Cross which they would not have had if they were acting individually.

## Count 8
### Joint liability common law conspiracy against all Defendants

168.    Ms. Cross incorporates by reference all prior paragraphs.

169.    Two or more of the Defendants engaged in a common design or agreement, express or otherwise, to commit a wrongful act.

170.    One or more of the Defendants committed a tortious act in furtherance of the common design or agreement.

### Request for Relief

171.    WHEREFORE, Ms. Cross respectfully requests the Court grant the following forms of relief:

a.  Enter judgment in favor of Ms. Cross and against the Defendant on all counts of the Complaint;

b.  Enter a declaration that Defendants violated Ms. Cross's rights under the United States Constitution and Massachusetts and United States law as alleged;

c.  Enter an order expunging and/or vacating the wrongfully obtained harassment prevention order[7];

d.  Enter an order enjoining Defendants from engaging in further retaliatory or harassing actions against Ms. Cross;

e.  Award compensatory and punitive damages in an amount determined at trial;

f.  Award Ms. Cross attorneys' fees, costs, and interest as permitted by law; and

g.  Grant such further and other relief as may be just and proper.

---

[7] Ms. Cross acknowledges that the Court's power is likely limited as to the wrongfully obtained harassment prevention order. She nonetheless includes the request for completeness.

### Demand for Jury Trial

172.    Ms. Cross demands a trial by jury on all claims and issues.

Dated:    June 11, 2025
Boston, Massachusetts

Respectfully submitted,

**EMILY CROSS**

By her attorney,

Joshua O'Neill, Esq.
BBO# 704512
617.356.7784
josh@bostondefender.com



**BOSTON
DEFENDER**
LLC

www.bostondefender.com
240 Elm St, 2nd Floor
Somerville, MA 02144